Exhibit 2

# Exhibit 2

**Labor Relations Connection**
**Tammy Brynie, Esq., Arbitrator**

_____

In the matter between:

Harvard Graduate Students
Union, United Auto Workers,
Local 5118                         LRC No. 626-22
                                   (Merits)

-  and -


Harvard University
_____


**Decision and Award**


**For the University**

Damien M DiGiovanni, Esq.


**For the Union**

Patrick N. Bryant, Esq.


**Background**

A procedural arbitrability determination issued on

May 20, 2024, rejecting the Employer's contention that

the grievance was untimely.[1]  Now, I address the merits,
to decide:

> Did the University violate the CBA by failing to
> classify psychology PhD students conducting
> research as Research Assistants under Article 1
> and/or as Research Assistant 1 under Article 2?
>
> If so, what shall be the remedy?

The University has also posed a substantive
arbitrability objection, arguing that the psychology
graduate students at issue "do not meet the common law
employment test for statutory employment status set out
in *Columbia*[2], and therefore are outside the
jurisdictional prerequisite for unionization and
coverage under the Parties' CBA." University Brief, at
p. 63.  I will address the University's argument in the
Opinion, below.

Admission to the University's Psychology PhD program
is highly competitive.  Department Chair Matthew Nock
testified that, in the year or so prior to this
arbitration, the Psychology Department (Department)
received about 1,400-1,500 graduate applications, with

---

[1] The initial timeliness determination and this decision are to be
read together, with the previously cited background, bargaining
history, and contract provisions also applicable here.
[2] *Columbia University,* 364 NLRB 1080 (2016).

the Department usually admitting about 12-15 students per year. Tr. 500.  When applying, candidates list up to three faculty mentors they would like to work with. Generally, Ph.D. candidates will apply to the University and seek to work with a faculty member and a related laboratory that aligns with their areas of inquiry/research interests. Tenured or tenured track Department members run labs, conduct research, and serve as a lab's Principal Investigator (PI). Tr. 505-506.  Psychology Ph.D. students[3] retain a laboratory assignment throughout their graduate student process, although, with approval of a new PI, graduate students may change their laboratory affiliation.

The Department has about 28 tenured or tenure track faculty members, with a corresponding number of separate labs. Tr. 357, 504. The Psychology Department, at least with respect to its graduate programs, is comprised of four general areas – clinical psychology, social psychology, developmental psychology, and an area referred to as cognition, brain, and behavior. Tr. 509-511. Nock testified that psychology is a science,

---

[3]  A graduate psychology student may leave the University with a master's degree, while others proceed further and, ultimately,

with scientific work, inquiry and research conducted in labs. Nock also indicated that psychology is very much an empirical discipline, with research results shared in empirical articles and papers. Tr. 551.

Each psychology lab has its own research focus, budget, and staff.  The PI faculty member functions, in effect, as the lab CEO, with the ability to set the lab's structure, including articulating its mission and areas of research, hiring staff and detailing staff duties and expectations. Typically, a lab has several paid staff members – individuals who are not University students.  Labs often employ post-baccalaureate researchers (recent graduates gaining research and employment experience), post-doctoral researchers and a lab manager. Many psychology labs look like offices, with workstations and meeting areas that may be used to interact with research participants, Tr. 558, 612-613. A more common expectation of a "laboratory" is an area containing microscopes, test tubes, petri dishes or pipettes. In other words, in colloquial terms, psychology labs are "dry labs" involving more computational or data analysis work, in contrast to

receive a Ph.D.

the "wet labs" used in conjunction with research involving biological matter or chemicals. Tr. 274-275.

A psychology lab receives a "start-up" budget from the University.  Department labs also rely on funding from outside grants or through gift funding.  Tr. 553-556.  For example, Nock testified that he has received research grants from the National Institute of Mental Health, from the Department of Defense, the US Air Force, and the Department of the Army. He has also received gift funding from private foundations. Tr. 553. In order to maintain grant funding, faculty members need to fulfill  the terms of the grant, including pursuing the expected areas of research and describing the research work performed.  In some instances, the staff (or job classifications) that will be providing aspects of the work will also be detailed. Post-baccalaureate research assistants and post-doctoral research assistants may be funded pursuant to a faculty member's grant, with their employment efforts directed towards conducting the related research and/or fulfilling the "deliverables" required by the grant.

Graduate students that are admitted to the Department are also assigned to a laboratory. In practical terms, it appears that a faculty endorsement – in effect, an agreement to admit a candidate to their laboratory, with the corresponding responsibility to serve as their advisor and supervisor of research – is an aspect of a successful application.

Once admitted to the Department, graduate students often take between five to seven years to complete their Ph.D. requirements and receive their degree. The University guarantees first and second year students' tuition, health insurance fees and stipend. Employer Exhibit #33.[4] During years three and four, Department graduate students may be compensated through teaching fellowships. Employer Exhibits #33, 36. Teaching Fellows receive a specific appointment letter and become members of the bargaining unit. Employer Exhibit #39. Alternatively, Departmental graduate students have worked as appointed Research Assistants, often assisting on a faculty member's research. During their final year within the Department, students receive a

---

[4] Guaranteed tuition, health insurance fees and related stipends often total about $100,000 per year.

"Dissertation Completion Fellowship" – a stipend similar to that received in years one and two.  While some Departmental graduate student's fifth year is devoted to dissertation work, other students have a longer Ph.D. completion timeline.  Graduate students may receive additional funding through teaching fellowships or by working, pursuant to a specific research associate assignment, which relates to a faculty member's grant or designated project.

   Some Departmental graduate students also receive external funding relating to their education and undertaken research.  A departmental graduate student may receive a National Science Foundation fellowship to fund the student's research.  For example, ███████ ████████ applied for, and received, a National Science Foundation Graduate Research Fellowship in advance of his matriculation at the University. Tr. 125.  ████████ testified that he designed the grant with his prospective-PI to be aligned with her broader research areas of interest.  ████████ joined the Department with external funding, a situation that, in general, provides funding specifically for the student that will cover costs including tuition and health insurance

fees. Tr. 631-632. Bringing NSF funding to the
University, in effect, benefits the University because
less University money is needed to cover guaranteed
tuition and stipend benefits. Tr. 663-634. A University
PI, however, often has an oversight function with
respect to a student's external funding, including
providing verification and acknowledgment that the
student award recipient is undertaking the expected
research and completing the related work.

Upon admission to the Department's graduate program,
expected academic considerations apply.  The contours
of the Psychology Graduate Program are detailed within
Union Exhibit #26.  Generally, required courses are a
focus of a student's first and second years.  Students
usually take four courses per semester, with one course
generally affiliated with the student's lab assignment.
The specific expectations relating to a lab course may
vary from lab to lab.  In general, attendance at a
weekly lab meeting, participation of lab discussions of
on-going research, providing feedback about on-going
research, and presenting or participating in discussion
of research results/projects appear to be common lab
course expectations.

The Psychology Graduate Program Overview details
academic course requirements and projects. The First
Year Project is intended to involve the student in
research, under the supervision of a faculty mentor.
Union Exhibit #26, p.3.  First-year projects may vary
widely in form and content. As Nock testified, as a PI,
he would have a series of meetings with a student to
develop a research idea and guide them through the
project process. Tr. 643. Nock indicated that a student
is expected to be responsive to the feedback provided
by a faculty mentor. Tr. 644.  Ultimately, the mentor
is required to provide an assessment of the student's
project.

A further, more accomplished scientific product
is expected pursuant to the Department's Second Year
Project. A second year project is also done under the
supervision of a faculty mentor. The second year
project is a more formal, complete research paper, like
a  journal article. Union Exhibit #6, p. 4; Tr. 649.
The graduate program guidelines state "Many students
produce a product similar to a draft of a manuscript
that would be sent out for review at a scholarly
journal." Union Exhibit #26, p. 7.  A second year

project begins with a prospectus, followed by feedback
from a faculty committee.  Then, research is conducted
under faculty supervision and a paper is written. Tr.
649.  A PI may provide feedback with respect to any
aspect of the project and there is an expectation that
such feedback will be considered. If a second year
project paper is published, the PI would be on the
paper, to acknowledge scientific contributions. Tr.
649.  A published second year project paper may be
noted on the related laboratory's website. Tr. 650.

    After the Second Year Project, a Department Ph.D.
student's next project is a dissertation.
Historically, students had produced a major (in the
150-200 page range) single work.  A more recent, and
increasingly popular, dissertation option involves a
set of three studies, leading to the production of
three papers.  Nock explained that the three paper
option – literally three papers sandwiched together
with an introduction and discussion – "is intended to
be closer to the what students are being trained to do
in their professional career." Tr. 549. Published
dissertation material would list a lab PI as a co-
author.

A Clinical Psychology Handbook is applicable to
graduate students within the clinical psychology area
of study. Union Exhibit #24.  A document included
within the Handbook is the format to be used, annually,
by the PI to evaluate a student's performance and
progress in the areas of academic performance, clinical
performance, research performance, graduate student
role and professional attributes.  The attributes and
features to be consideration with respect to research
performance are: "performance in research sequence
courses, progress and quality of doctoral projects,
critical thinking, writing skills, research
sophistication; **active participation/leadership in
mentor's research projects**, ability to use and
interpret quantitative and qualitative strategies and
methodologies; independence and competence of ideas,
collection of data." Union Exhibit #24, *emphasis added*.
Nock acknowledged that the handbook and evaluation
format has been in effect during his time as Department
Chair but indicated that active anticipation/leadership
in mentor's research projects is not something that
he's ever considered. Tr. 673.  Nock testified that he
advises first year graduate students that they are
"junior colleagues to pursue their education and

research ideas, and they are not here to do the work of
our faculty." Tr. 674. Nock also noted that he is
explicit in that regard, as some first year students
had previously been post-baccalaureate research
assistants. Tr. 674.

Nock testified about the collaborative nature of a
psychology lab.  Although Nock regarded a graduate's
student's laboratory and research work as largely self-
directed and educational in nature, he also explained
that his lab was a collaborative environment, with lab
members working together and assisting each other.  Tr.
617. Nock gave an example of students working on a
project together, with one exploring suicide among
youth and another interested in suicide among Black
youth, with the result that they could, in effect,
became joint collaborators. Tr. 617-619. Research
relating to a collaborative project would be performed
under the  auspices of a PI's lab, with the PI having
the ability to provide feedback and guidance.  A
resulting publication, if any, would list the
collaborators as authors and may list the PI as well.
Nock testified that he may be included as a co-author,
in recognition of his scientific contribution to a

project. In addition, Nock indicated that he had
graduate students in his lab who had published papers
without him as a co-author, because the student's work
was largely independent of his involvement. Tr. 652-
653.

Published papers note a lead author and list a
variety of contributors, often including the
laboratory's PI. For example, Nock described his work
with graduate student GF, who had transferred to his
lab and became a student under his supervision.
Although GF's research did not overlap with Nock's work
pursuant to his grants, he was a co-author on some, but
not all, of his papers. Tr. 579-581. Nock testified
that a student had been a lead author in about 10% of
his 350 or so publications. Tr. 586.  He did not know
the frequency of students being designated co-authors
on his publications. Tr. 586.

Several current and former graduate student
witnesses testified about the collaborative nature of
laboratory work and their experiences of being authors,
co-authors or contributors on publications. At the time

of his testimony ████████████ was a rising fifth year graduate student in the University's Ph.D. psychology program.  He is affiliated with Katie McLaughlin's stress and development lab.  ████████'s C.V., as updated in January 2023, is Union Exhibit #1. The C.V. has a "Peer-Reviewed Publication" section, containing 13 items, with 9 publications dating from his University graduate school period.  ████████ is the lead author on one publication and is a co-author/contributor on the others.  McLaughlin is listed as the lead author of one of the nine publications and is listed on six others.  ████████ estimates that about 80% of his publishing contributions are related to his work with McLaughlin's lab. Tr. 149.  ████████ further estimated that about 40 to 50% of the research that he has conducted in the lab has been related to his dissertation. Tr. 176.  Only one of the publications detailed on his C.V., ████████ testified, relates to his thesis. Tr. 174.

████████ was evaluated by McLaughlin using the ratings format contained within the Clinical Psychology Handbook.  ████████ received the highest rating - a 5 - in each applicable performance area.  Union Exhibit #5.

McLaughlin's evaluation comments illustrate the type and range of ███████'s lab-based activities during his initial graduate school year.  In the Research Progress narrative, McLaughlin wrote, in part:

> ██████ has made remarkable progress on research in his first year in graduate school.  He published a first author paper in *Clinical Psychological Science...* ██████ has completed the data analysis for his second year project and is currently writing up the results for publication.
>
>        *   *   *
>
> In addition to these projects, ██████ has been a core member of the team that organized an ongoing set of longitudinal assessments of pandemic-related stressors, mental health, and protective factors in several large samples of children collected in my lab.  We have submitted one paper from these efforts already, with several others in the works – ██████ will be a co-author on all papers to come from this data.
>
>                         Union Exhibit #5.

██████████ graduated from the University, with a Ph.D., in May of 2023.  ██████'s University application related to a specific lab -- the Vision Sciences Lab -- and he conducted research during his entire graduate school program with that lab affiliation. Tr. 216. The Vision Sciences Lab has two principal investigators, Talia Konkle and George Alvarez.  ██████ applied specifically to work with Konkle, and she served as his primary advisor. Tr. 218.  ██████ explained that the

nature of the Vision Sciences Lab is a computational cognitive neurocytes lab, conducting research on the visual cortex of the brain through a variety of methods, including neuroimaging methods from neuroscience, behavioral experiments from psychology, and computational tools from deep learning and computer science. Tr. 219.

████ testified that he co-conducted a number of projects that were not part of his thesis. He also contributed to a number of projects that other people were leading that were not part of dissertation or specific academic requirements. Tr. 216.  During his time at the University, ████ had several publications.  He testified that none of the work he conducted during his graduate program was published without Konkle being noted. Tr. 253.  A specific author contribution note, on one publication, indicates that a post-doctoral fellow (RW), ████ and Konkle designed the research; RW and ████ performed the research; RW analyzed the data; all three interpreted the results; Konkle and RW wrote the publication's first draft, while all three edited the paper.  RW and ████'s contributions to unpublished analytic tools

were also noted.  Union Exhibit #22.  ███████'s testimony
describes the blend of academic disciplines and
methodological approaches that are used, in a
collaborative process, within the Visions Sciences Lab.

███████████████'s testimony describes her research
work in a chemical biology Ph.D. program, an area that
is considered to be within the STEM (science,
technology, engineering and math) field.  ████████
testified that she worked in a "wet lab," while also
indicating that aspects of STEM work, including physics
labs and mathematics, tended to be more "dry lab" work.
Tr. 275.  ████████ testified that graduate students
within her program do "rotations" amongst available
laboratory options, before joining a lab.  Nonetheless,
████████ testified, she was considered to be a bargaining
unit member right away, including when she was in lab
rotations. Tr. 277.  Following rotations, ████████
indicated that, in her program, students ask a PI if
they may join a lab, and, upon a PI's agreement, they
do so. Tr. 278.  ████████ joined Daniel Kahne's lab in
the chemistry department. Tr. 278.

Broadly, within that lab, a group of graduate students and post-doctoral researchers study antibiotic resistance.  More specifically, they study cell envelope biogenesis in gram-negative bacteria. Tr. 279. ███ described, without contradiction, that there has never been a time during her University graduate studies when she was not part of the bargaining unit. She also testified that there is no one she knows, within the STEM area, who is not part of the bargaining unit. Tr. 293-294.

███████ described his research and lab-based work as a third year graduate student within the neuroscience program, known as PIN. The neuroscience program is affiliated with the Department of Neurobiology, but graduate students may have rotations with any lab and PI affiliated with the program. ███ testified that he rotated to Sam Gershman's lab during his first year, and then joined that lab. Tr. 309.[5] ███ was a member of the bargaining unit during

---

[5] ███ testified the rotation process involved contacting "the PI if you are interested in rotating with them, and if they have the space and bandwidth to advise you for that rotation, then they let you join…" Tr. 329.  During his rotations, R███ did not get a research associate appointment letter to a specific lab; yet he was still considered to be a bargaining unit member. Tr. 329. Upon

his first year rotation and has been a research
assistant within the Gersham lab thereafter. Tr. 310.

Four graduate students are affiliated with the
Gersham lab.  Two students are in the program in
neuroscience (PIN) and two are psychology graduate
students. Tr. 311. ███████ testified, without
contradiction, that the lab duties and responsibilities
of the psychology students and neurobiology students
are identical. Tr. 318. They all have the same PI - Sam
Gersham. They all work within the same collaborative
environment.  The PIN students, however, are considered
bargaining unit research assistants from the time they
begin their graduate studies, even if they receive
independent funding from external sources.  Psychology
students, in contrast, are not.

On April 30, 2022, the Union filed a Department wide
grievance with respect to graduate students' RA
appointment status. Employer Exhibit #24.  The
grievance was processed to arbitration.  Stipulations
of fact and related exhibits were introduced addressing

---

joining Sam Gershman's lab, ███████ completed appointment letter
paperwork. Tr. 330.

the University's contention that the grievance was
procedurally deficient on timeliness grounds.  A full
record with respect to the merits – whether the
University violated the collective bargaining agreement
by failing to classify psychology PhD students as
research assistants – was also developed.  After
finding no timeliness violation, I have considered the
parties' comprehensive submissions with respect to the
merits of this dispute.  For ease of reference, I
repeat the relevant collective bargaining agreement
provisions.

### Relevant Contract Provisions

**ARTICLE 1**
**RECOGNITION**

As reflected in the National Labor Relations
Board Case 01-RC-186442, the University
recognizes the International Union, United
Automobile, Aerospace and Agricultural Implement
Workers of America (UAW), and its Local Union,
Harvard Graduate Students Union-UAW Local 5118
(HGSU-UAW Local 5118), as the exclusive
bargaining representative for employees in the
bargaining unit. The bargaining unit shall
include all students enrolled in Harvard degree
programs employed by Harvard University who
provide instructional services at Harvard
University, including graduate and undergraduate
Teaching Fellows (teaching assistants, teaching
fellows, course assistants) and all students
enrolled in Harvard degree programs (other than

undergraduate students at Harvard College)
employed by Harvard University who serve as
Research Assistants (regardless of funding
sources, including those compensated through
Training Grants). This bargaining unit includes
students employed by Harvard University and
enrolled in the Harvard Graduate School of Arts
and Sciences, Harvard Business School, the
Division of Continuing Education, Harvard
Graduate School of Design, Harvard Graduate
School of Education, the Harvard John A. Paulson
School of Engineering and Applied Sciences, the
John F. Kennedy School of Government at Harvard
University, Harvard Law School, Harvard Divinity
School, Harvard Medical School, the Harvard T.H.
Chan School of Public Health and Harvard College.
Excluded: All undergraduate students serving as
research assistants and all other employees,
guards and supervisors as defined in the Act.

**Article 2**
**TITLES AND CLASSIFICATIONS**

**Section 1.**  As of the effective date of this
agreement all Student Workers performing the
duties below shall be placed into titles and pay
classifications based on the nature of the duties
and eligibility as follows:

Research Assistant 1, Performs research
(including scientific rotations) under the
supervision of faculty/principal/museum director.
Eligibility:  Harvard enrolled graduate students.

       *    *    *

**Section 5.** Definitions

Rotation – Most commonly found in programs within
the natural sciences, a rotation is a period of
time, commonly shorter than a semester, in which
a Ph.D. student conducts research with an
individual faculty member's research group.
Within an academic year a student would perform
multiple rations within different faculty lab
groups, most commonly within the student's

academic program.  The intent of a rotation is to
assist the student and potential faculty advisor
to determine if the lab/research group is best
suited to the student's doctoral research.

        *    *    *

**Article 20**
**COMPENSATION**

    *    *    *
**Section 2.** Compensation for salaried SWs.

A. Research Assistant 1-
A graduate student usually appointed on an annual
basis for a 12-month period to perform research
work under the supervision of a faculty/principal
investigator.  The parties understand that the
work of a Research Assistant is a blend of
academic and employment endeavors and that the
clear separation of each is difficult.  The
stipend that such an RA receives could be
characterized as financial assistance or
compensation or both.  Thus, it is understood
that for this category of SW and for purposes of
this Agreement only, the stipend offered by the
University is the functional equivalent of a
salary and will be referred to as such in this
Article only.
                        Employer Exhibit #3.


                **Contentions of the Parties**

    The Union asserts that lab-based psychology doctoral

students conducting research under the supervision of

faculty in charge of their lab qualify as bargaining

unit Research Assistants.  While a union normally has

the burden of persuasion on a non-disciplinary contract

interpretation matter, an employer seeking to exclude a position from the unit bears that burden.

This dispute involves an interpretation of the parties' collective bargaining agreement. Standard contract interpretation principles – including interpreting plain language, history, the contract as a whole, and past practice – reveal that lab-based psychology doctoral students conducting research, including grant-funded research, under faculty/PI supervision meet the unit definition unit definition under Article 1 and/or research assistance definition under Article 2.

The plain language of Article 2 defines a Research Assistant as an individual the performs research under the supervision of faculty member/principal investigator.  Article 1 indicates that such research assistant status is without regard to funding sources – an acknowledgment of the array of funding sources within the realm of scientific research.

Reading the contract language within the context of the entire contract affirms that lab-based psychology students qualify for the bargaining unit under the CBA.

Following the 2016 election, the parties negotiated language, at Article 2, Section 1, that expanded unit coverage to include students on laboratory rotations. In addition, the parties' agreement shows an express and deliberate rejection of an academic/employment binary.

Guidance in the interpretation of the contract language is provided by accepted and undisputed practice regarding status of laboratory-based doctoral students conducting research: all STEM laboratory-assigned enrolled doctoral students are considered research assistants under Articles 1 and 2. The contract language applies to lab-based doctoral students, whether their research is funded by the PI, Harvard grants, and/or eternal foundations and institutions.

The facts demonstrate that psychology doctoral students conduct research during mandatory assignments to a collaborative laboratory enterprise under the supervision of their faculty/PI. Thus, they meet the bargaining unit definition. Psychology students' circumstances are identical to those of OEB (Organismic

and Evolutionary Biology)[6] students and other STEM-based researchers who are considered to be within the bargaining unit, even when not funded by their PI.  It is clear that if Psychology was denominated as STEM, the doctoral students at issue would be regarded as in the bargaining unit. Due to an arbitrary organizational quirk, they are regarded as researching in the Humanities/Social Sciences field.  The University's varied arguments to differentiate lab-based psychology students are without merit.

The University has violated the collective bargaining agreement by failing to recognize lab-based psychology graduate students as bargaining unit research assistants.  As remedy, the University should be required to make the bargaining unit members whole, including payment of all benefits and payments lost as a result of bargaining unit status, including processing of any claims by excluded employees and payment of dues to the unions for improperly excluded employees (without deduction or reimbursement from employees).

---

[6]President and Fellow of Harvard College, Case 01-RC-186442, at p. 13-15. (2017).

\*   \*   \*

The University contends that graduate students who
are not serving as Teaching Fellow or Research
Assistants are not employees pursuant to the NLRB's
decision in *Columbia* and, therefore, are outside of
the collective bargaining agreement's Recognition
Clause.  The NLRB's decision in *Columbia* established
the basis for finding that some, but not all, students
were also employees and, therefore, could unionize.
This understanding is reflected by the clear and
unambiguous language of the Recognition Clause, which
requires that graduate students be "employed by"
Harvard as TFs or RAs to be within the bargaining
unit.  The purported grievants do not meet the common
law test for statutory employment status set out in
*Columbia*, and therefore are outside the jurisdictional
prerequisite to unionization and coverage under the
parties' CBA.

Unlike the student-employees in the existing
bargaining unit, psychology graduate students who are
not appointed as TFs or RAs have no employment
responsibilities or service requirements tied to their

funding.  Because the financial support they receive
is not conditioned on any service expectations to the
University, the purported grievants are not employees
under the common law or under *Columbia*. Because they
are not employees, as a matter of law, they cannot be
part of the bargaining unit and are outside the CBA's
recognition clause.

Applying *Columbia* to the present case reveals that
the Psychology graduate program lacks several indicia
of employment.  The students at issue do not perform
services to the University as a condition for
receiving their funding. Psychology students receive a
stipend that is provided outside of the University's
payroll system.  No W-2s are issued and taxes are not
withheld. The academic stipends provided to the
purported grievants fit into the recognized definition
of "no-strings educational grants."

The distinction between employment services provided
by RAs and TFs, on the one hand, and the purely
academic work of the purported grievants, on the other
hand, is not a distinction of the University's making.
It is a well-established distinction that exists

across other legal contexts, including federal
immigration law and federal tax rules.  Disregarding
these distinctions will lead to significant negative
consequences, especially for the international
Psychology students - about 25% of the Department —
who rely on this distinction to make timely academic
progress and earn additional income at the University.

   The reference to graduate students in "STEM" is
irrelevant to whether Psychology students are
employees within the bargaining unit.  The Union
called only one current and one former Psychology
graduate student in this matter; the remainder of the
Union's witness were graduate students from other
"STEM" departments, as the Union refers to them.
Other University departments maintain different
structures and have different requirements and are
therefore entirely irrelevant to this case.  The Union
has failed to establish that Psychology graduate
students are common law employees, and it ignores the
key inquiry under applicable law and the CBA, namely
whether the specific student is "employed by" the
University, not whether other students – with

completely different academic requirements – are or
are not.

The Union's grievance is without merit.  Because the
Psychology graduate students at issue – i.e., those
graduate students who are not appointed as TFs or RAs
– do not receive funding that is contingent upon their
providing services to the University, they are not
employees pursuant to the NLRB's common law test in
*Columbia University.*  Therefore, as a matter of law,
the purported grievants cannot be part of the
bargaining unit.  This has been the status quo since
the commencement of the bargaining relationship (and
before), and there is no basis in the record to amend
that status through this grievance.

**Opinion**

My role, as a selected arbitrator pursuant to the
procedures detailed within the parties' collective
bargaining agreement, is to interpret and apply the
provisions of their negotiated agreement.  The issue to
be resolved is:

Did the University violate the CBA by failing to
classify psychology PhD students conducting
research as Research Assistants under Article 1
and/or as Research Assistant 1 under Article 2?

The University asserts that a precursor question
must be answered -- namely, are psychology graduate
students common law employees, pursuant to the NLRB's
decision in *Columbia?*  In effect, the University argues
that this matter is not substantively arbitrable absent
such a determination.  I disagree.

Prior to this grievance, the parties have addressed
the contours of the bargaining unit in other
proceedings, including at the NLRB, Case 01-RC-186442,
a proceeding that addressed, among other matters,
voting eligibility/bargaining unit status and the
direction a second election.[7]  The parties have
negotiated contracts and refined language relating to
bargaining unit eligibility.[8] The filed grievance
alleges that the collective bargaining agreement has
been violated by the University's failure to classify

---

[7] NLRB, Case 01-RC-186442 (2017), (OEB graduate students deemed
eligible to participate in representational election) at p. 13.
[8] Doctoral students on laboratory rotations are now included within
the bargaining unit, as a Research Assist is now defined to include
"research (including scientific rotations ) under the supervision
of faculty/principal investigator/museum curator." Employer Exhibit
#3, Article 2, Sections 1 and 5.

psychology PhD students conducting research as Research Assistants under Article 1 and/or as Research Assistant 1 under Article 2. That is what I will consider and decide.

The University's insistence that I must, necessarily, first determine whether psychology graduate students meet a common law employment standard, in effect, seeks to revisit and reexamine settled matters.  The parties, through their negotiations and agreements, have agreed-upon language defining bargaining unit status. As a contract arbitrator, I will not revisit or disturb those agreements.

It is clear that lab-based psychology graduate students perform research under the supervision of a faculty member/PI. Indeed, psychology graduate students immediately join a research lab, with a corresponding requirement to fulfill a first year research project. In this regard, psychology students are like graduate OEB students, as both are commonly engaged in research work that would qualify them for inclusion in the

bargaining unit. See NLRB, Case 01-RC-186442 (2017) at
p. 13-15.

███████'s experience demonstrates that an initial
year within a psychology lab may result in a
publication – with a first year student as lead author
– while a PI also receives publication credit. Union
Exhibit #1, p.3. In contrast, within other science or
STEM programs, students engage in rotations during
their first year, before selecting a lab/research
group. Yet, they are already considered bargaining unit
employees, while lab-based psychology students, who are
already settled in a long-term lab assignment, are not.

Lab-based psychology students conduct research in a
collaborative environment.  As ██████ and ████████
explained, they attend lab meetings; engage with
colleagues, including providing research related
feedback; mentor or otherwise assist new lab members;
and provide contributions to research publications.
According to the Clinical Psychology Handbook's student
evaluation form, "active participation/leadership in
mentor's research projects" is actually a research
expectation. Union Exhibit #24, Union Exhibit #5.

The incongruity of the University's failure to consider lab-based psychology students as research assistants within the bargaining unit is demonstrated by the situation within the Gersham lab. ██████' uncontroverted testimony demonstrated that all four graduate student lab members have identical lab duties and responsibilities.  Yet, the two PIN graduate students have always been considered bargaining research assistants, but the psychology students have not. Instead, a psychology student was only considered to be an in-unit RA when funded by the PI.  The result, as the Union correctly notes, is that a PIN student conducting research pursuant to an NSF grant is an in-unit RA1, but a psychology student conducting research pursuant to an NSF grant, within the same lab, is not.

I find no logical basis for the distinction in bargaining unit research assistant status between the PIN graduate students and psychology students within in the Gersham lab.  And, more broadly, the record does not reflect demonstrable differences between the STEM disciplines (and OEB) students' and the lab-based psychology graduate students' research expectations and

obligations that would warrant a distinction in their
bargaining unit status.

    No argument raised by the University to support
such a distinction is persuasive. Nock and McLaughlin
spoke eloquently and with conviction about the academic
benefit and educational underpinnings of the laboratory
and research experience. McLaughlin described it as a
process of learning by doing. However, with respect to
the current contractual bargaining unit determination
dispute, the University's assertion that psychology
Ph.D. students are solely engaged in laboratory
academic endeavors in support of their scientific
training is misplaced.

    The parties have recognized, at Article 20, Section
2, that the work of a research assistant "is a blend of
academic and employment endeavors and that a clear
separation of each is difficult."  Employer Exhibit #3.
The parties have, through their negotiations, rejected
a binary distinction between academic and employment
work.  The PIN graduate students in the Gersham lab and
the psychology graduate students perform substantially

similar lab and research work but, inexplicably,  have
different bargaining unit statuses.


    The University has failed to establish a persuasive
rationale for that distinction. Contrary to the
assertion that lab-based activities are solely academic
in nature, ██████ and ███████'s unrebutted testimony
demonstrates that a majority of their lab-related
publications, reflecting undertaken research work and
analyzed results, were unrelated to their
dissertations. Their collaborative research work also
benefited their colleagues and respective labs. As a
result, I reject the University's suggestion that the
lab-based psychology students' work is purely academic
and without bargaining unit status.


    Finally, the assertion that determining that lab-
based psychology doctoral students meet the contractual
definition of a research assistant would jeopardize the
visas of international psychology students is
unpersuasive. International student visas may limit
their weekly hours of University work to 20 hours. The
collective bargaining agreement, however, already
limits the bargaining unit work of doctoral students to

20 hours per week. Employer Exhibit #3, Article 16.
The parties have also negotiated provisions and
procedures to assist and support international students
facing visa uncertainty or related problems.  Employer
Exhibit #3, Article 13. Finally, STEM students (without
exceptions for international students) have been
considered research assistants throughout their
graduate student program, without demonstrated visa
consequences noted in this record.  I am not persuaded
that international students' circumstances are
determinative here.

    Overall, I am convinced that lab-based psychology
graduate students meet the negotiated contractual
parameters for inclusion within the bargaining unit. I
also determine that the University has violated the
collective bargaining agreement by failing to classify
psychology PhD students conducting research as Research
Assistants under Article 1 and/or as Research Assistant
1 under Article 2.  As remedy, the University will be
directed to make lab-based psychology students whole,
by considering them to be Research Assistant as of
April 30, 2022.  The bargaining unit Research
Assistants shall be made whole for benefits and

payments lost as a result of their prior non-bargaining unit status, including the processing of any claims by excluded employees.

- + -

**AWARD**

The University violated the CBA by failing to classify psychology PhD students conducting research as Research Assistants under Article 1 and/or as Research Assistant 1 under Article 2.

As remedy, the University shall:

- Designate all lab-based psychology PhD program students as bargaining unit Research Assistants as of April 30, 2022.

- Make bargaining unit psychology Research Assistants whole for lost benefits and payments from April 30, 2022 forward.

- Process the claims of formerly excluded psychology student employees.

I will retain jurisdiction for 60 days, renewable upon request, for the sole purpose of resolving remedial disputes, if any.

/x/ Tammy Brynie
Arbitrator
June 28, 2024