## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br><br> Plaintiff. <br><br> v. <br><br> HARVARD GRADUATE STUDENTS UNION – UNITED AUTOWORKERS, LOCAL 5118, <br><br> Defendant. | Civil Action No. 1:24-cv-11952 |

## DEFENDANT'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGEMENT

Defendant Harvard Graduate Students Union-United Auto Workers, Local 5118 (Union) hereby opposes the motion for summary judgment filed by Plaintiff President and Fellows of Harvard College (Harvard) to vacate the Timeliness and Merits Awards[1] issued by Arbitrator Tammy Brynie, and files this memorandum in support of its cross-motion. The grounds upon which Harvard seeks to vacate the award are so frivolous that this Court should not merely confirm the Awards but also grant attorney fees, costs, and expenses to the Union.

Here, the parties are signatories to a collective bargaining agreement (CBA) that covers "all students enrolled in Harvard degree programs … employed by Harvard University who serve as Research Assistants (regardless of funding sources, including those compensated through Training Grants)," and defines a research assistant as one who "[p]erforms research (including scientific rotations) under the supervision of faculty/principal investigator/museum director." Doc. No. 27-5, at 3, Art. 1 & 2. This matter arises from a dispute about whether certain

---

[1] The Union refers collectively to the Timeliness Decision and Merits Decisions and Award as Decisions or Awards.

1

psychology Ph.D. students who conduct research under supervision of faculty meet either definition and who, unbeknownst to the Union, Harvard had excluded by Harvard.

The CBA contains a broad arbitration clause to resolve interpretive disputes. *Id*., at 6. (grievances are "any dispute concerning the interpretation, the application, or claimed violation(s) of a specific provision(s) of this Agreement"). Articles 1 and 2 are not excluded from arbitration. Grievances must be filed within "30 business days after the event, or after the grievant should have become aware of the event, giving rise to the grievance" and, if not, are forfeited "[a]bsent extraordinary circumstances." *Id*. After the Union demanded arbitration, the parties agreed that the Arbitrator they selected could frame the issues. She determined the issues were whether the grievance was untimely and whether Harvard violated the CBA by failing to classify psychology PhD students as Research Assistants under Article 1 and/or Research Assistant 1 under Article 2. She acknowledged Harvard's substantive arbitrability challenge.

The Arbitrator rejected Havard's untimeliness argument, as she found the Union was not on sufficient notice in Fall 2020 about the near-categorical exclusion of psychology doctoral students assigned to conduct research under the supervision of faculty and, moreover, the situation qualified for the "extraordinary circumstances" exception. She also determined that the students at issue conducted research under the supervision of faculty and therefore met the contractual definitions of research assistant. Her conclusion was guided by the parties' voluntary, post-election expansion of the bargaining unit, and by the nearly identical nature of work performed by lab-based research assistants indisputably in the unit.

Under case law so well-settled that Harvard's argument is frivolous, the Arbitrator's conclusion that that grievance is procedurally arbitrable is immune from review. Harvard's hodge podge of incoherent and inconsistent arguments to contend the Award is substantively

inarbitrable, contrary to plain language, and in violation of public policy, likewise should be rejected. As the Grievance/Arbitration article expressly authorizes an arbitrator to resolve disputes regarding interpretations and applications of the CBA, the Arbitrator clearly had authority to determine whether psychology doctoral students assigned to laboratories conducting research under faculty supervision met the definition of research assistants under Articles 1 and/or 2. Harvard nonetheless offers a novel and incoherent argument to contend that the matter is substantively inarbitrable: the Arbitrator declined to address what Harvard claims to be a threshold issue - whether the disputed student workers are "employees" under the NLRA. The illogic of this argument is demonstrated by Harvard's contemporaneous admission admits that the Arbitrator lacked authority to address NLRA matters, and by its omission of any request that the matter be remanded for her to so determine.

A review of the careful and deliberative Decisions shows that they drew their essence from the CBA. Rather than ignore plain language of Articles 1 and 2, the Arbitrator simply rejected Harvard's preferred interpretation of them. The Awards were not against public policy because neither a vote nor employee status under the NLRA is a predicate to representation. The Awards should therefore be confirmed, with Harvard ordered to pay interest, fees and costs.

## I. Facts

### a. Timeliness

The Union was certified by the National Labor Relations Board (NLRB) to represent a bargaining unit of several thousand student workers at Harvard. Timeliness Decision, Doc.

No. 27-2 at 8, at 6-8.[2] Their CBA includes a Grievance and Arbitration Article with the

following provisions:

a.  Any formal grievance must be filed at Step One of this Article within thirty (30) business days after the event, or after the grievant should have become aware of the event, giving rise to the grievance.

b.  *Absent extraordinary circumstances*, failure by the [Student Worker] SW, group of SWs or the Union to comply with the time limitations of this Article at any of the Steps, including the initial filing of the grievance, shall constitute a forfeiture of the right to pursue the grievance and shall preclude any further processing of the grievance.

c.  Unless the parties have agreed in writing to a specific extension of time, any grievance or demand for arbitration which is not filed at each Step within the time limits contained herein shall be deemed waived and there shall be no further processing of the grievance or any arbitration thereon.

*Id*. at 8-9 (emphasis added).

The parties agreed to language requiring the University to provide a weekly electronic

file of certain contact information for all individuals in the bargaining unit, including title and

department. *Id*. at 9-11. The Union sought to have an up to date list of all members within the

bargaining unit, along with the means to contact them.  *Id*. at 11-12.

Until September 10, 2020, Harvard did not provide weekly lists including bargaining

unit workers. *Id*. The initial list provided September 10 included 4,236 student workers; a list

provided two months later included 7,764 unit employees, including some psychology

doctoral students listed with the title research assistant. *Id*. at 29. Since then approximately 35

psychology graduate students have been included on each weekly list, out of 75-80 graduate

students enrolled in the Department. *Id*. at 13.

---

[2] The Arbitrator's Timeliness and Merts Decisions were attached as, respectively, Exhibits 1 and 2 to the Complaint, Doc. No 1, Exh. 1 & 2, and as Exhibits 2 and 3 to Fisher's Declaration referred to in the Statement of Facts. Doc. No. 27-2 and 27-3.

In response to an information request on a different grievance about the exclusion of Population Health Sciences [PHS] employees from weekly lists, Harvard stated, *inter alia*, "To its knowledge, the lists provided on and after November 13, 2020 are accurate; however, the University reserves the right to make corrections to the list as needed to align the list to the bargaining unit definition." *Id*. at 14.

On June 30, 2021, the Union filed a grievance based upon Human Evolutionary Biology [HEB] Department workers being excluded from the weekly lists. *Id*. at 14. The Union stated, "we noticed that student workers were removed from the bargaining unit list between Fall 2020 and Spring 2021, however we have not received any information about why this change occurred." *Id*. at 14. Like the PHS students, the HEB students had been left off weekly lists starting in November 2020. Unlike PHS grievance, the Union waited months to file a grievance, seeking to understand whether the exclusion was intentional and if so, why.. Doc. No. 1, Exh. 8, at 12. See also *id*. at 17: "In this case, [Redacted] confirmed that as of the fall of 2020, he was aware that there were individuals in HEB that were not included on those lists." The University challenged the arbitrability of the HEB grievance. *Id*. The parties agreed to bifurcate the timeliness issue and Arbitrator Harvey Shrage, after the close of hearing in the instant matter, issued an Award determining that "the filing of the [HEB grievance] was not timely." *Id*. at 16-19; Timeliness Decision, Doc. 27-2 at 15.

On February 7, 2022, the Union filed a grievance on behalf of a psychology graduate student (lead Grievant) who was denied a letter of appointment to a bargaining unit Research Assistant position, asserting that the student "is currently performing research duties under the supervision of" a named faculty/PI and that his duties were "including but not limited to overseeing research projects, assisting in the hiring of other lab workers, and collecting data

for ongoing research projects." Timeliness Decision, Doc. 27-2 at 18. The student had never been included on any weekly employee list provided to the Union. While this grievance was being processed, the Union, on March 29, 2022, stated it was "investigating the possibility that all PhD student workers in the Department of Psychology are not being classified as Research Assistants and are erroneously being excluded from the bargaining unit, despite performing research assistant work." *Id*. at 19. On April 30, 2022, the Union filed a second, class-action grievance, on behalf of Department students, alleging, *inter alia*, that, "[s]tarting in the spring term of 2022, the Union noticed that the student workers in Psychology engaged in research work were left of the weekly bargaining unit lists." *Id*. at 20. Harvard denied both grievances. The Union demanded arbitration of the class-action grievance but not the individual one.[3] *Id*.at 21.

**b.  Merits**

Psychology is a science, with scientific work, inquiry and research conducted in labs, and an empirical discipline, with research results shared in articles and papers. Merits Decision at 3-4. The Department has about 28 tenured or tenure track faculty members, with a corresponding number of separate labs. Id. The faculty run labs, conduct research, and serve as their lab's Principal Investigator (PI). *Id*. Each lab has its own research focus, budget, and staff. *Id*. at 4. The PI/faculty functions, in effect, as the lab CEO, with the ability to set the lab's structure, including articulating its mission and areas of research, hiring staff and detailing staff duties and expectations. *Id*. Typically, a lab has several paid staff members who

---

[3] Harvard contends that the Union's decision not to proceed with arbitration on the individual grievance waived any claim that the lead Grievant was improperly excluded from weekly lists under the class-action grievance. Doc. No. 25 at 19 n.10. Not so. Harvard stipulated: "The Union did not file for arbitration with regard to this grievance, however, [the individual] falls within the class at issue in this case." Fischer Decl., Doc. No. 27, Exh. 6, at 7, ¶40. And the Arbitrator so found. Timeliness Decision, Doc. 27-2 at 21.

are not Harvard students, such as post-baccalaureate researchers (recent graduates gaining research and employment experience), post-doctoral researchers and a lab manager. *Id*. Many psychology labs look like offices, with workstations and meeting areas that may be used to interact with research participants. *Id*. at 4-5. Psychology labs are "dry labs" involving more computational or data analysis work, in contrast to the "wet labs" used in conjunction with research involving biological matter or chemicals. *Id*.

A psychology lab receives a "start-up" budget from the University. *Id*. at 5. Labs also rely on funding from outside grants or through gift funding such as from various federal agencies and private foundations. In order to maintain grant funding, faculty members need to fulfill the terms of the grant, including pursuing the expected areas of research and describing the research work performed. *Id*. In some instances, the staff (or job classifications) that will be providing aspects of the work will also be detailed. *Id*. Post-baccalaureate research assistants and post-doctoral research assistants may be funded pursuant to a faculty member's grant, with their employment efforts directed towards conducting the related research and/or fulfilling the "deliverables" required by the grant. *Id*.

Graduate students admitted to the Department are assigned to a laboratory. *Id*. at 6. In practical terms, a faculty endorsement – in effect, an agreement to admit a candidate to their laboratory, with the corresponding responsibility to serve as their advisor and supervisor of research – is an aspect of a successful application. *Id*. They retain the same assignment throughout their graduate student process, although, with approval of a new PI, may change their laboratory affiliation. *Id*.

Department students often take between five to seven years to complete their Ph.D. requirements and receive their degree. *Id*. Harvard guarantees first and second year tuition,

health insurance fees and a stipend. *Id*. During years three and four, graduate students may be compensated through teaching fellowships, for which they receive a specific appointment letter and become members of the bargaining unit. *Id*. Alternatively, graduate students have worked as appointed research assistants, often assisting on a faculty member's research. They may receive additional funding through teaching fellowships or working pursuant to a specific research associate assignment, relating to a faculty's grant or designated project. *Id*. at 7.

Some graduate students also receive external funding relating to their education and undertaken research, such as a National Science Foundation (NSF) fellowship, which can cover costs including tuition and health insurance fees. *Id*. The lead Grievant applied for, and received, one in advance of his matriculation to Harvard. *Id*. He designed the grant with his prospective-PI to be aligned with her broader research areas of interest. *Id*. Bringing NSF funding, in effect, benefits Harvard because less University money is needed to cover the student's guaranteed tuition and stipend benefits. *Id*. at 8-9. A Harvard PI, however, often has an oversight function with respect to a student's external funding, including providing verification and acknowledgment that the student award recipient is undertaking the expected research and completing the related work. *Id*. at 9.

Department doctoral students enroll in a lab course, whose specific expectations may vary, but generally involves attendance at a weekly lab meeting, participation in lab discussions of on-going research, providing feedback about on-going research, and presenting or participating in discussion of research results/projects. *Id*. at 8.

Doctoral psychology students usually follow a three-paper model for dissertation: a first-year project, a second-year project and a dissertation – all conducted under the supervision of a faculty mentor, with the student expected to be responsive to their guidance.

*Id*. at 9-12. The goal is publication, id. at 9 ("Many students produce a product similar to a draft of a manuscript that would be sent out for review at a scholarly journal") for which PI is credited and may be noted on the website of the PI's laboratory. *Id*. at 11.

Student evaluations address performance and progress in the areas of academic performance, clinical performance, research performance, graduate student role and professional attributes, with factors under consideration including: "performance in research sequence courses, progress and quality of doctoral projects, critical thinking, writing skills, research sophistication; **active participation/leadership in mentor's research projects,** ability to use and interpret quantitative and qualitative strategies and methodologies; independence and competence of ideas, collection of data." *Id*. (*emphasis by Arbitrator*). The lab is a collaborative environment, with lab members working together and assisting each other. *Id*. at 12. Published papers note a lead author and list a variety of contributors, often including the laboratory's PI. *Id*. at 13.

Several current and former graduate student witnesses testified about the collaborative nature of laboratory work and their experiences of being authors, co-authors or contributors on publications. *Id*. at 13-20. The lead Grievant was listed as lead author on one-peer reviewed publication resulting from his University lab-based research and a co-author/contributor to eight other publications and only one relates to his thesis. *Id*. at 14. His PI is listed on seven of his publications as an author/contributor, including one as lead. *Id*. The lead Grievant estimated no more than half of the research he has conducted in the lab has been related to his dissertation. *Id*. His faculty/PI's evaluations noted that his second year project is being written up for publication, he was considered a core member of the team on a major lab project and he "will be a co-author on all papers to come from this data." *Id*. at 15.

A recently graduated student assigned to a different lab testified about involvement in a number of studies that were not part of his thesis, or part of the dissertation or specific academic requirements of fellow students leading those studies. *Id*. at 15-16. All the publications of work during his time as a Psychology graduate student credited his lab PI. *Id*.

A graduate student in chemical biology, which is considered to be within the STEM (science, technology, engineering and math) field, testified that STEM graduate students are classified as unit employees for their entire time as a graduate student, including when doing rotations among various laboratories and assigned to a wet or dry lab. *Id*. at 17-18.

Another student testified about the Gersham lab, which includes two graduate students in the Department of Neurobiology (PIN) and two graduate students in Psychology. *Id*. at 19-20. The lab duties and responsibilities of all four graduate students are identical; they have the same PI and work within the same collaborative environment. *Id*. The PIN students, however, are considered bargaining unit research assistants from the time they begin their graduate studies, even if they receive independent funding from external sources. *Id*. Psychology students, in contrast, are not. *Id*.

### c. Arbitration Decisions/Awards

The parties could not agree on the issues to be decided by the Arbitrator, but they agreed that she could frame them in light of their respective proposals. Timeliness Decision, Doc. No. 27-2 at 2. The Arbitrator ultimately framed the issues as:

> Is the grievance timely filed?

> If so, did the University violate the CBA by failing to classify psychology PhD students as Research Assistants under Article 1 and/or Research Assistant 1 under Article 2?

> If so, what shall be the remedy?

*Id*. In both Decisions, she acknowledged the University raised a substantive arbitrability

challenge and addressed it in the latter. *Id*. at 3; Merits Decision, Doc. No. 27-3 at 2.

### i.    Timeliness

The Arbitrator rejected the University's claims that the grievance was untimely based

on assertions: a) the Union knew or should have known, by Fall 2020, that Psychology PhD

students who had laboratory assignments and were engaged in lab-based activities were not

designated and b) that Arbitrator Shrage's decision is dispositive. Timeliness Decision, Doc.

No. 27-2 at 28. Harvard argued that the Union was on notice of the purported violation in

November 2020, and did not argue alternatively that the Union was on notice as of February

7, 2022 when it filed the individual grievance. Exhibit 1, Bryant Decl. at 7 ("The Union then

did not file the instant Department-wide grievance until April 30, 2022, which was *more than*

*20 months* after being notified initially and then on a weekly basis via the employee lists that

the purported grievants were not included in the unit.") (emphasis original).

The Arbitrator found that the Union first learned the near categorical exclusion of

psychology doctoral students conducting research in a laboratory under the supervision of

faculty occurred in researching the individual grievant involving the student who was the lead

Grievant in the underlying grievance here.  Timeliness Decision, Doc. No. 27-2 at 31.She

determined that the weekly lists provided to the Union in Fall 2020 were, for purposes of

Article 6, Section 3, insufficient notice that Harvard categorically excluded PhD psychology

students with laboratory assignments performing research under the supervision of faculty

from the bargaining unit. *Id*. Her determination was based in part on the lists of several

thousand student workers provided to the Union included some psychology students as RA's.

*Id*. at 29. Additionally, she found that the situation qualified for the "extraordinary

circumstances" proviso in Article 6, § 5,[4] given the nascency of the bargaining unit, and the

volume, variation and complexity of bargaining unit positions across a vast bureaucracy. *Id*. at

30. "More broadly, I interpret the "extraordinary circumstances" timeliness exception and

determine it is applicable here." *Id*. at 31. She noted, for instance, these challenges led to

Harvard's initial non-compliance with the list requirement and that the list of student workers

nearly doubled in two months. *Id*.[5]

She did not consider Arbitrator Shrage's Award as dispositive, which involved a

different set of facts involving the Union's intentional forbearance in filing a grievance

despite actual knowledge that the workers in dispute were excluded. *Id*. at 31.

### d.  Merits Decision

The Arbitrator identified Articles 1, 2 and 20 as the pertinent provisions of the CBA to be

interpreted. Merits Decision, Doc. No. 27-3 at 20-22.[6] She declined to consider common law

employee or NRLA status as a threshold issue to whether the psychology graduate students met

the definition of Articles 1 or 2. *Id*. at 31.

She found based on the evidence that lab-based psychology graduate students perform

research under the supervision of a faculty member/PI, and therefore met the definition of

Articles 1 and 2. *Id*.. The parties have negotiated contracts and "refined language relating to

---

[4] Section 5(A) provides, "*Absent extraordinary circumstances*, failure by the SW, group of SWs, or the Union to comply with the time limitations of this Article at any of the Steps, including the initial filing of the grievance, shall constitute forfeiture of the right to pursue the grievance and shall preclude any further processing of the grievance." Timeliness Award at 5 (emphasis added).

[5] "The inherent complexity involved with the initial identification of bargaining unit student workers and the intricate task of monitoring the initial lists for potential violations of the collective bargaining agreement, contribute to my determination that, with respect to the instant Psychology PhD challenge, the "extraordinary circumstances" proviso within Article 6, Section 5 would preclude any forfeiture of the Union's ability to have this matter considered now." *Id*. at 31.

[6] In her Timeliness Decision, she found the dispute involves the interpretation and application of the CBA's Recognition Clause and the Titles and Classification provision relating to Research Assistant. Doc. No. 27-2, at 30.

"bargaining unit eligibility," citing the example of doctoral students on laboratory rotations who were ineligible to vote in the NLRB election. Merits Decision, Doc. 27-3 at 24 & n.8. She determined the disputed individuals to be analogous to Organismic and Evolutionary Biology [OEB] Department students determined by the NLRB to be included in the unit, and the practice of including STEM-based laboratory students performing identical work, who are included in the unit prior to laboratory assignments and during rotations. *Id*. at 30-31 & n.7. See also Exhibit 2 to Bryant Declaration. She cited the Gersham Lab as demonstrating the "incongruity of the University's failure to consider lab-based psychology students as research assistants" because "uncontroverted testimony demonstrated that all four graduate student lab members have identical lab duties and responsibilities." Merits Decision, Doc. No. 27-3 at 33. It is clear, she wrote, "that lab-based psychology graduate students perform research under the supervision of a faculty member/PI." Id. at 25.

   She found that Harvard violated the CBA by failing to classify psychology PhD students conducting research as Research Assistants under Article 1 and/or as Research Assistant 1 under Article 2, and she ordered Harvard to designate all lab-based psychology PhD program students as bargaining unit Research Assistants as of April 30, 2022 and make them whole for lost benefits and payments from April 30, 2022 forward and process the benefits claims of formerly excluded psychology student employees. *Id*. at 37. Harvard admits it has failed to comply with the remedy ordered by Arbitrator Brynie. Amended Counterclaim, Doc. No 21 at 12, Counterclaim ¶7; Amended Answer to Counterclaim, Doc. No. 22 at 3, ¶7 ("Harvard admits that it has not complied with any purported remedy. Further answering, Harvard brought this action to vacate the Award.")

## II.    Argument

### a.    Standard for Review of Arbitration Awards

A district court's review of arbitral awards must be "extremely narrow and exceedingly deferential." *UMass Mem'l Med. Ctr., Inc. v. UFCW*, 527 F.3d 1, 5 (1st Cir. 2008). Arbitral awards are "nearly impervious to judicial oversight," *Teamsters Local Union No. 42 v. Supervalu, Inc.,* 212 F.3d 59, 61 (1st Cir. 2000), because both parties "have contracted to have disputes settled by an arbitrator" and therefore "it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 37-38 (1987). "That a reviewing court is convinced that the arbitrator committed error—even serious error—does not justify setting aside the arbitral decision. This remains true whether the arbitrator's apparent error concerns a matter of law or a matter of fact." *UMass Mem'l Med. Ctr.,* 527 F.3d at 5. An arbitrator's factual or legal error does not supply a basis for vacating the award. *Union De Tronquistas De Puerto Rico, Local 901 v. United Parcel Serv., Inc.,* 149 F. Supp. 3d 246, 250 (D.P.R. 2016). It is the arbitrator's result, not their reasoning, which is subject to judicial review. *Coastal Oil of New England, Inc. v. Teamsters Local,* 134 F.3d 466, 469 (1st Cir.1998).

### b.    The University's Novel and Meritless Substantive Arbitrability Argument Is An Inappropriate Collateral Challenge to Arbitrator's Findings and Interpretations.

There is a well-established presumption of arbitrability, *AT & T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 650 (1986), that can be rebutted if only it "be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted disputes. Doubts should be resolved in favor of [arbitration]." *Id. Accord Loc. 285, SEIU, AFL-CIO v. Nonotuck Res. Assocs., Inc.,* 64 F.3d 735, 738 (1st Cir. 1995).

The instant grievance concerns whether lab-based psychology doctoral students conducting research under the supervision of faculty or PI meet the definition of research assistants under Articles 1 or 2. Article 1 recognizes bargaining unit members to include "all students enrolled in Harvard degree programs …. employed by Harvard University who serve as Research Assistants (regardless of funding sources, including those compensated through Training Grants). Article 2 defines Research Assistant 1 as one who performs "research (including scientific rotations) under the supervision of faculty/principal investigator/museum curator." The CBA provides, "A grievance is any dispute concerning the interpretation, the application, or claimed violation(s) of a specific provision(s) of this Agreement." Articles 1 or 2 are not excluded from arbitration. *Compare* Art. 7, § 5.B.3 (claims alleging sexual harassment, misconduct and/or discrimination "shall not be processed under Article 6, Grievance & Arbitration.") The Arbitrator therefore had authority to resolve the dispute between the parties concerning the interpretation of Articles 1 and 2. See also *Appollo Systems, Inc.*, 360 NLRB 687, 688 (2014); *United Bhd. of Carpenters & Joiners of Am., Loc. Union No. 1694 v. W.T. Galliher & Bro., Inc.*, 787 F.2d 953, 954 (4th Cir. 1986).

Because there obviously is not positive assurance that the broad arbitration provision excludes disputes under Articles 1 and 2, Harvard concocts an unprecedented substantive inarbitrability theory – that that Arbitrator had jurisdiction only if she first addressed a threshold issue of whether the class of grievants qualified as employees under the National Labor Relations Act (NLRA).[7] The problem with this argument is that Harvard admits that the Arbitrator has no

---

[7] Havard's citation to *Local 285, SEIU v. Nonotuck Res. Assocs., Inc.*, 64  F.3d 735, 739 (1st Cir. 1995) is of no support to its contradictory proposition that the Arbitrator exceeded her authority by *not* exercising authority. Setting aside that the Arbitrator did in fact address the substantive arbitrability argument, *Nonotuck* did not deal with an arbitrator exceeding their authority by omission or otherwise. It was a pre-arbitration challenge that addressed whether the employer's refusal to arbitrate was frivolous enough to warrant an order by the court to paying the Union's legal fees to compel arbitration.

authority to interpret the NLRA or determine substantive arbitrability. Doc. No. 25 at 12. Such a

position, shared by the Union, is consistent with federal common law of labor arbitration. See,

e.g., *Challenger Caribbean Corp. v. Union Gen. de Trabajadores de Puerto Rico*, 903 F.2d 857,

866 (1st Cir. 1990) (arbitrator "has no general authority to invoke public laws that conflict with

the bargain between the parties," unless such authority is conferred by the parties.).[8] There is no

precedent to support Harvard's incoherent argument that the grievance was not substantively

arbitrable because the Arbitrator neglected to address an issue that she lacked authority to

address.[9]

Thus, Harvard's substantive arbitrability argument is simply a thinly-veiled effort to

circumvent the judiciary's extreme deference to arbitrator findings and interpretations. Her

interpretation of Articles 1 and 2 as being not predicated on common-law employee status is

impervious to challenge. *Teamsters Loc. Union No. 42 v. Supervalu, Inc.*, 212 F.3d 59, 67 (1st

Cir. 2000) (arbitrator not faulted for "reluctance to engage in that type of linguistic

microsurgery"); *Twin River-Tiverton, LLC v. United Auto Workers, Loc. #7770*, 2020 WL

7029659, at *6 (D.R.I. 2020) (declining to vacate award because arbitrator did not closely

conform to canons of statutory construction in interpreting CBA).

---

[8] The finger wagging at the Arbitrator for failing to address a threshold issue that she cannot address demonstrates the frivolousness of Harvard's complaint. Harvard does not seek for the Court to remand the case in order to address what it purports to be "the threshold issue." Harvard argued that because the disputed workers are not employees, she had no authority to address the dispute. Had the Arbitrator resolved the threshold issue in favor of the Union, there is little doubt Harvard would have moved to vacate that determination as exceeding her authority.

[9] Harvard contends that the Arbitrator acknowledged but chose to ignore its argument that the grievance was substantively inarbitrable. Doc No. 25 at 12. That is flatly untrue. Merits Award, Doc. No. 27-3 at 30: "In effect, the University argues that this matter is not substantively arbitrable absent such a determination. I disagree."

    **c.    The Arbitrator's Interpretation of Articles 1 and 2 as Applying to Lab-Based Psychology Graduate Students Conducting Research Under the Supervision of Faculty Did Not Ignore the Agreement's Plain Language**.

Harvard's contention that the Arbitrator ignored the CBA's plain language that purportedly defines bargaining unit employees as those "employed by" Harvard is refuted by even a cursory review of her Decisions. The Arbitrator cited, discussed and interpreted Articles 1, 2 in addition to other myriad articles. Rather than ignoring the plain language, she acknowledged and interpreted the provisions in light of the entirety of the agreement, bargaining history and past practice of similarly situated employees. *Radio & Television Broad. Engineers Union, Loc. 1212 v. WPIX*, 716 F.Supp.777, 781 (S.D.N.Y. 1989) ("bargaining history, past practices, rights established under earlier agreements, and other rudimentary sources of contract construction" are all appropriate sources to guide an arbitrator's interpretation of a CBA); *Providence J. Co. v. Providence Newspaper Guild*, 271 F.3d 16, 21 (1st Cir. 2001). Harvard fails to cite any case for the proposition that "employed by" or Articles 1 and 2 are so plain and unambiguous as to be capable only of Harvard's interpretation.[10] *Wheelabrator Envirotech Operating Servs. Inc. v. Massachusetts Laborers Dist. Council Loc. 1144*, 88 F.3d 40, 44 (1st Cir. 1996) (as matter of first impression "we might well have decided this case otherwise, given our standard of deference and the ambiguity of contractual language, we cannot say the arbitrator's reading of the successor clause merely reflects the arbitrator's own notions of industrial justice".)

---

[10] The Arbitrator's conclusion that the bargaining unit status was not confined to NLRA employees was supported by undisputed bargaining history. She found that the parties agreed to include positions, for example doctoral students on laboratory rotations, which were previously excluded during the NLRB election. The Arbitrator determined that the laboratory work performed by psychology doctoral students was nearly identical to laboratory work performed by graduate OEB students that the NLRB determined to be employees and in the unit, and work performed by STEM doctoral students acknowledged to be in unit. The Gersham Lab group of employees was particularly persuasive to her analysis. She found no logical basis for the University to include PIN students conducting research pursuant to an NSF grant as in-unit RA1s, but excluding psychology students conducting research pursuant to an NSF grant with the same duties and responsibilities in the same lab. See generally Docket No. 27-3 at 29-37.

### d.  The Arbitrator's Rejection of Harvard's Procedural Inarbitrability Defense Is Immune to Judicial Review.

"Issues of procedural arbitrability are for the arbitrator, not the court, to decide." *UMass Mem'l Med. Ctr.*, 527 F.3d at 5. "Thirty years of Supreme Court and federal circuit court precedent have established that issues concerning the timeliness of a filed grievance are 'classic' procedural questions to be decided by an arbitrator." *Nonotuck*, 64 F.3d at 739.

Here, the CBA requires a grievance to be filed "within thirty (30) business days after the event, or after the grievant should have become aware of the event, giving rise to the grievance" and a failure to do so forfeits the right to pursue the grievance "[a]bsent extraordinary circumstances." The Arbitrator rejected Harvard's claim that the grievance should have been filed within 30 days of production of the Fall 2020 weekly lists, which did not include all psychology doctoral students performing research under the direction of a PI. She found that those lists, by including some psychology research assistants, did not adequately place the Union on notice about a broad exclusion. She further found that that the situation qualified for the "extraordinary circumstances" proviso. Harvard provides no authority to disturb this finding.[11][12]

---

[11] Harvard faults the Arbitrator for failing to find the April 30, 2022 class action grievance untimely by claiming that the Union was on notice as of February 7, 2022 when it filed the individual grievance. The University, however, did not make this argument to the Arbitrator. See Harvard's post-hearing brief, Exhibit 1, Bryant Decl.

[12] Harvard suggests that the Arbitrator's conclusion that the grievance qualifies for "extraordinary circumstances" exemption undermines her finding that the Union was not on notice about the dispute in 2020. This is exactly the kind of pedantic review disfavored by the First Circuit. *Supervalu*, 212 F.3d at 67 ("To be sure, the arbitrator's decision is not entirely a model either of consistency or clarity. But we do not review arbitral decisions for style points, and the arbitrator's core message—that the CBA, as drafted, permitted the employer unilaterally to pay classes of employees more (but not less) than the agreed minimum wage—comes through with sufficient precision."). Her determination that the grievance was not untimely has the same precision.

   **e.  The Awards Did Not Violate Any Well-Defined Public Policy Even If
        Disputed Class Are Not "Employees" Under the NLRA**.

Without citation to any analogous authority, Harvard contends that the Award

interpreting Articles 1 and 2 as applying to the psychology doctor students assigned to

laboratories and conducting research under the supervisor of faculty/PI violates public policy

embodied with the NLRA because only "employees" defined under the NLRA have a right to

unionize, and because employees are entitled to vote on whether to be represented by a Union.

Neither proposition is correct as a legal matter nor sufficient to vacate the Award as violating an

"explicit ... well defined and dominant" public policy, as ascertained "by reference to ... laws and

legal precedents." *Wynn MA, LLC v. Unite Here!, Loc. 26*, No. 23-CV-11223-ADB, 2024 WL

2962805, at *2 (D. Mass. 2024).

Numerous laws and cases contradict the claim that voluntary agreements and bargaining

units are enforceable, even if it includes individuals who are not "employees" under the NLRA

and/or is a unit not permitted the NLRA.[13] Harvard's example of supervisors, per *NLRB v.*

*NSTAR Elec. Co.*, 798 F.3d 1 (1st Cir. 2015) to support its contention that employers have no

duty to bargain with a union purporting to represent individuals unprotected by the NLRA,

actually defeats its argument. While supervisors are excluded from the definition of employees,

29 U.S.C. §152, employers, by statute and caselaw, are not prohibited from including them in a

bargaining unit or CBA. See 29 USC §164(a) (supervisors do not become "employees" if

---

[13] Several laws entitle employees, expressly or implicitly excluded by the NLRA, to engage in concerted,
protected activity. See, e.g., 5 USCA § 7101, *et seq* (Federal Labor Relations Act); 45 USCA § 151 *et seq*
(Railway Labor Act); M.G.L. c.150E, §1 et seq. (Massachusetts public employees). See also *Greene v.*
*Dayton*, 806 F.3d 1146, 1149 (8th Cir. 2015) (state law may confer collective bargaining rights on
domestic home care providers, as with agricultural employees, despite express exclusion from NLRA);
*Operation & Maint. Serv., Inc. Westover Job Corps. Ctr./G.E. v. Lab. Rels. Comm'n*, 405 Mass. 214, 218
(1989) (per 29 USC 154(c)(2) & G.L. c. 150A, § 10(b), state labor commission may assert jurisdiction
over petition dismissed by NLRB).

permitted to remain in union or unit). Employers have the freedom of contract to recognize a unit that includes supervisors. See *Loc. Union No. 1055, IBEW, AFL-CIO v. Gulf Power Co.*, 175 F. Supp. 315, 319-20 (N.D. Fla. 1959) ("Nor can it be said that compulsion will result in requiring the Company to arbitrate with the Union relative to foremen, where the Company has, in fact, so contracted."); *E.G. & H. Inc. v. NLRB*, 949 F.2d 276, 279 (9th Cir. 1991), *as amended* (Dec. 19, 1991) (where employer consents to a bargaining unit that includes supervisors, NLRB may find employer guilty of an unfair labor practice with respect to that unit); *Sunrise Operations, LLC*, 373 NLRB No. 30 (2024) (mixed unit not a defense to ULP). This liberty also extends to recognizing other units not otherwise required by or even permitted under the NLRA. *See e.g., Truck Drivers Local Union No. 807 v. NLRB,* 755 F.2d 5, 8 (2d. Cir. 1985) (employer cannot be compelled to recognize a mixed guard union, but may do so and if so, "may not discontinue the relationship during the contract period").[14] Even if it is assumed or determined that psychology students at issue in the grievance are not "employees" under the NLRA, the Awards do not violate the Act by enforcing Harvard's voluntary agreement to include them via Articles 1 and 2.

Second, the Act does not automatically prohibit employees from being included in a unit without a vote. Both the accretion doctrine and unit clarification procedure endorsed by the NLRB and courts allow employees to be added to a unit without an election. *NV Energy, Inc. &*

---

[14] The NLRB has found an unlawful withdrawal of recognition where the employer argued that some unit employees were confidential employees, *Carolina Tel. & Tel*., 258 NLRB 1387 (1981). The NLRB has ordered a bargaining remedy in a voluntarily recognized unit that mixed professionals and non-professionals notwithstanding Section 9(b)'s specific command that such a unit cannot be found appropriate. *Integrated Health Servs.*, 336 NLRB 575 (2001). See also *Motor Rim & Wheel Serv.*, 273 NLRB 866 (1984) (ULP for employer to unilaterally remove a confidential employee from unit midterm); *Arizona Elec. Power*, 250 NLRB 1132, 1134 n.10 (1980) (inclusion of managerial or supervisory employees enforceable during life of CBA).

*IBEW, Loc. 396*, 362 NLRB 14, 16 (2015). See also *Bob's Tire Co. v. NLRB*, 980 F.3d 147, 155 (D.C. Cir. 2020) (noting possibility of accretion).[15]

Rather than being inimical to representation disputes, the NLRB has expressly endorsed arbitration. In *Appollo Systems Services*, *supra*, the Board agreed that an arbitrator could appropriately determine, in the first instance, whether the parties agreed to include certain employees in the unit. See *St. Mary's Med. Ctr.*, 322 NLRB 954 (1997) (agreeing to defer, in unit clarification matter, to arbitral determination of whether contractual recognition clause excluded new position). The interpretation of the contractual recognition clause here does not involve matters of statutory policy such as community of interest, *Appollo Sys,* is not contrary to any NLRB determination, *Hotel & Rest. Emps. Loc. 274 (Warwick Caterers)*, 282 NLRB 939, 940 (1987) (filing of grievance alleging new employees are covered by existing CBA did not violate Act where NLRB had not yet determined that employees were not in unit); *Small v. OPCMIA Local 200*, 611 F.3d 483, 489-93 (9th Cir. 2010), and is not in furtherance of an illegal objective. *See T. Equip. Corp. v. Massachusetts Laborers' Dist. Council*, 166 F.3d 11 (1st Cir. 1999) (damages award to laborers for loss of work, was void in light of NLRB allocation of work to carpenters).

The Awards do not offend any explicit and well-defined public policy, particularly for purported policies cited by Harvard.

---

[15] Accretion applies community of interest factors to determine whether the employees at issue may constitute a separate appropriate unit or constitute an accretion to the existing bargaining unit, whereas clarification applies when a new classification is performing the same basic functions as a unit classification historically had performed. *In Re Premcor, Inc.,* 333 NLRB 1365, 1366 & n.5 (2001)

III.    **The Court Lacks Authority in Section 301 Action to Address NLRA-Based Challenges to the Award**.

Harvard contends that the Award must be vacated because the disputed employees do not qualify as employees under the NLRA and/or are denied the right to vote. In addition to being legally and factually incorrect, these arguments are not properly before this Court. The NLRB has primary jurisdiction over disputes on representational issues, *Newspaper Guild of Salem v. Ottaway Newspapers, Inc.*, 79 F.3d 1273, 1283 (1st Cir. 1996). Harvard can avail itself of procedures for the federal agency charged with addressing such issues in the first instance. *Universidad Cent. de Bayamon v. N.L.R.B.*, 793 F.2d 383, 391 (1st Cir. 1985) (university free to seek unit clarification, per 29 C.F.R. § 102.60 (b), or may refuse to bargain over the rights of the contested employees, to bring matter before court). But see *Hotel & Rest. Emps. Loc. 274 (Warwick Caterers)*, *supra* (because question of representation had not been previously determined by the Board, effort to enforce CBA as to certain employees did not violate Act).

IV.    **The Awards Should Be Confirmed & Harvard Ordered to Pay Interest, Costs, Fees**.

Because there are no grounds to vacate the Awards, they should be confirmed. *See*, *e.g.*, *ALS & Assocs., Inc. v. AGM Marine Constructors, Inc.*, 557 F. Supp. 2d 180, 185 (D. Mass. 2008). Harvard, which admits not complying with the Awards, should be ordered to pay interest on damages from when the award was issued. *Millcraft-SMS Servs., LLC v. United Steel Workers of Am.*, 346 F. Supp. 2d 1176, 1186-87 (N.D. Ala. 2004). The challenge to the Awards is so specious, this Court should order attorney's fees and costs. Harvard makes a mockery of the contractual commitment to final and binding arbitration, and the "extremely narrow and exceedingly deferential" judicial review, *UMass Mem'l Med. Ctr.,* by filing an appeal lacking any remotely analogous authority, that so nakedly attempts to have the Court impermissibly

revisit facts, interpretations, and arguments rejected by the Arbitrator. A party needlessly forced

to defend and confirm an arbitration award is entitled to attorney's fees. *Nonotuck, supra*.

**V.    Conclusion**

For aforestated reasons, the Union requests that the Court grant its cross-motion for

summary judgement, deny Harvard's motion, and order it to pay interest, costs and fees.

Respectfully submitted,

HARVARD GRADUATE STUDENTS
UNION – UNITED AUTOWORKERS,
LOCAL 5118,

By its attorney,

/s/ Patrick N. Bryant
Patrick N. Bryant, BBO #652200
Pyle Rome Ehrenberg PC
2 Liberty Square, 10th Floor
Boston, MA 02109
(617) 367-7200
pbryant@pylerome.com

Dated: December 9, 2024

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on December 9, 2024, the above document was
filed through the Electronic Case Filing System for filing and thus accomplished electronic
service to the registered participants as identified on the Notice of Electronic Filing.

/s/ Patrick N. Bryant
Patrick N. Bryant